UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**LEVITA ALMUETE FERRER,**<br><br>Defendant. | **Crim. Case No. 25-108-CRC** |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

From March 2022 through April 2024, Levita Almuete Ferrer abused the trust that the State Department placed in her by misusing her signature authority on a State Department checking account to embezzle more than $650,000. On 63 separate occasions, she chose to steal from American taxpayers. Her criminal conduct, which was driven by an insatiable gambling addiction, left Ferrer's former colleagues bewildered and betrayed—how could the woman whom they routinely consulted for guidance have stolen money from the organization they were dedicated to serving. To Ferrer's credit, when federal agents confronted her about her conduct, she provided a full confession. She also pled guilty quickly and promised to sell three properties to partially satisfy her financial obligations. Thus, at the time of her guilty plea, she appeared headed on a path to redemption, fully committed to doing everything possible to mitigate the harm that she had inflicted. Unfortunately, she quickly strayed from that path. The same day that this Court ordered her not to go to casinos, she went to the MGM National Harbor. She went back again a week later too. She gambled thousands of dollars that should have been set aside for restitution and also backtracked from her promise to sell the three properties. As a result of her conduct and to reflect the factors set forth at 18 U.S.C. § 3553(a), the Court should sentence her to 18 months in prison, the bottom of the guidelines range.

1

I.  **Background**

Ferrer was born in the Philippines, where she grew up in challenging circumstances. *See* PSR ¶ 49, 52-53. She immigrated to the United States in 1981 and became an American citizen two years later. PSR ¶ 57. She served honorably in the U.S. Navy for 25 years before joining the State Department in 2015. PSR ¶ 81-84. When she was in the Navy, she earned her bachelor's and master's degrees. There is no question that she has given much to this country and that this country has given much to her, as evidenced by her owning multiple properties and having assets totaling more than $1 million. PSR ¶ 88, 93.

Unfortunately, Ferrer's decision to start gambling in or around 2019 was a horrible choice. By 2021, she was at the casino almost every week. A year later, she was spending approximately $30,000 a month on slot machines, i.e., more than $350,000 a year. PSR ¶ 70. Between 2021 and 2024, she estimates that she lost nearly a million dollars gambling. PSR ¶ 70.

Ferrer's gambling addiction completely obliterated her positive reputation. In the eyes of many, she has gone from being seen as a hard-working, honest public servant to a serial thief who looted more than $650,000 from the State Department over a two-year period. Indeed, on 63 different occasions, she consciously ignored her responsibilities to the American government and taxpaying public by fraudulently writing checks, which she then deposited into her personal checking and savings accounts. PSR ¶ 21.

Her scheme had a devastating and embarrassing impact on her former colleagues. *See generally* ECF No. 21. State Department personnel spent hours trying to untangle her web of deceit and falsification of records. ECF No 21 at 1. Her former colleagues also felt an enormous sense of betrayal. One even had to read the DOJ press release announcing Ferrer's guilty plea multiple times to truly believe that "the same Levita" was the person who had stolen all this money. ECF

No. 21 at 2. Although Ferrer acted completely on her own, the reputational harm from her criminal conduct continues to impact the State Department. ECF No. 21 at 3.

On April 30, 2025, Ferrer pleaded guilty to one count of theft of government funds. As part of a Joint Stipulation with the government, she promised to engage a real estate broker to sell three real properties to help repay the money that she stole. ECF No. 7. She also agreed to refrain from going to casinos. She immediately violated her release conditions by heading to the MGM National Harbor and subsequently backtracked on her promise to sell the three properties.[1]

Since June 2, 2025, she has been in jail, the result of her decision to violate the Court's order to refrain from entering casinos.

## II. Sentencing Guidelines

The parties and the presentence investigation report writer agree that the following guidelines apply.

| | | |
|---|---|---|
| USSG § 2B1.1(a)(2) | Base Offense Level | 6 |
| USSG § 2B1.1(b)(1)(H) | Loss Amount: More than $550,00 | 14 |
| USSG § 3E1.1 | Acceptance of Responsibility | -3 |
| USSG § 4C1.1 | Zero-Point Offender Adjustment | -2 |

PSR ¶ 29-40. The defendant is in Criminal History Category I. PSR ¶ 43. Based on a total offense level of 15 and CHC I, the guidelines recommend a sentence of 18 to 24 months' imprisonment and a fine of $7,500 to $75,000. PSR ¶ 95, 116.

## III. The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford

---

[1] The government hopes that Ferrer will indeed make full restitution in this case and will work with defense counsel to try to ensure that happens, including reviewing a proposal that the defense sent today.

adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

The section 3553(a) factors support a sentence that consists of additional incarceration.

### A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Ferrer's embezzlement scheme was serious. She was entrusted with signature authority over a State Department checking account but decided to treat the account as her personal slush fund to fuel her slot machine addiction. Moreover, her criminal conduct was not limited to a few isolated incidents. Instead, it involved her deciding on 63 separate occasions to steal State Department money for her personal benefit. Each time she wrote one of the fraudulent checks, she was presented with a choice—to steal or not to steal. For more than two years, she repeatedly chose to steal. The nature and circumstances of her offense and need for the sentence to reflect the offense's seriousness weigh in favor of a sentence that includes significant additional incarceration.

### B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct

Although the government hopes that Ferrer has been specifically deterred from engaging in additional criminal conduct by spending several months in jail, even if that is indeed the case, the Court's sentence must still promote respect for the law and deter the public from engaging in similar criminal conduct. Accordingly, this factor also weighs in favor of a sentence of significant

additional incarceration to make it clear to would-be government employee embezzlers that if they violate the trust that the government has placed in them and steal over $650,000, the penalty will not just be a few months in jail.

### C. The History and Circumstances of the Defendant

Ferrer's history and circumstances are complicated. Like most defendants who appear before this Court, Ferrer did not enjoy an easy upbringing. *See generally* PSR ¶ 49-53. She overcame many of the obstacles noted in the PSR and served our nation honorably for more than thirty years. Yet, in March 2022, she crossed that dangerous path that separates right from wrong when she wrote her first fraudulent check in the amount of $4,800. She stayed on the wrong side of the path for two more years, repeatedly deciding to steal until she ultimately looted more than $650,000 from the government. Her service to our nation should be commended, but it does not offset the damage that she did to the point that she should avoid serving any additional time in prison.

### D. Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which

5

those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, "During the last five fiscal years (FY2020-2024), there were 498 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 15 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 123. Sixty-seven percent of those defendants received a prison sentence with the average length being 13 months with a median sentence of 12 months. Moreover, when considering all 498 defendants, the average sentence imposed was 10 months while the median sentence was still 12 months. PSR ¶ 123.

Here, a guideline sentence would not lead to an unwarranted sentencing disparity for Ferrer considering the specific circumstances of her case. First, although the average sentences referenced above are between 10 and 13 months, given that there are sentences that were much lower (33% received non-prison sentences), there also must be sentences that were much higher. Second, although Ferrer did not receive a two-level Abuse of Trust enhancement, she clearly abused the State Department's trust in her, and not just once or twice, but more than sixty times. Moreover, her conduct brought great shame to her coworkers and wasted valuable hours of their time trying

to investigate Ferrer's conduct. Accordingly, a sentence at the bottom of the guidelines would not lead to an unwarranted sentencing disparity.

## IV.   Restitution and Forfeiture

The government requests that the Court order Ferrer to pay restitution to the State Department in the amount of $657,347.50 and to orally reference at sentencing the $657,347.50 forfeiture money judgment that the Court already issued. ECF No. 13.

## CONCLUSION

The United States requests that the Court sentence Levita Ferrer to a total sentence of 18 months' imprisonment followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


By:   /s/ Kondi J. Kleinman
      Kondi J. Kleinman, Cal. Bar No. 241277
      Assistant United States Attorney
      Fraud, Public Corruption & Civil Rights Section
      601 D Street, N.W. | Washington, D.C. 20530
      202.252.6887 | kondi.kleinman2@usdoj.gov